Felisha A. BRADLEY, Plaintiff,

v.

CARYDALE ENTERPRISES, et
al., Defendants,

v.

Deborah GILL, Third Party Defendant.

Civ. A. No. 88–1362–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

April 5, 1989.

Niki Kuckes, Miller, Cassidy, Larroca &
Lewin, Kerry Alan Scanlon, Washington
Lawyers' Com. Civil Rights, etc., Washington, D.C., Victor M. Glasberg, Jonathan M.
Smith, Alexandria, Va., for plaintiff.

Ira S. Saul, Saul & Barclay, Fairfax, Va.,
for defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

### Introduction

This matter came before the Court in this instance on plaintiff's motion for summary judgment on her state and local housing discrimination claims. Plaintiff had pursued these claims before the Virginia Real Estate Board (the "Board") and the Fairfax County Human Rights Commission (the "Commission"). The question presented here, apparently novel in Virginia, is whether the findings of the Board or Commission are entitled to *res judicata* effect in a federal court action concerning the same claims. Although the findings of some state or local bodies may deserve preclusive effect, close scrutiny of the powers, procedures and attributes of the Board and the Commission compels the conclusion that such effect is unwarranted here. Plaintiff's motion must, therefore, be denied. Granting preclusive effect to the findings of state and local bodies is not a measure to be taken lightly. Caution must always attend the application of *res judicata*, for courts must be vigilant to ensure that parties are not deprived of their "day in court."

### Facts [1]

Plaintiff in this housing discrimination suit alleges that defendants, various landlord entities, discriminated against her on the basis of race by failing and refusing to act promptly and effectively to deal with her complaints. Specifically, plaintiff claims she and her guests were subjected to racial harassment by another tenant,[2] and defendants, for reasons of race, failed and refused to take any effective action.

Initially, plaintiff elected to pursue her state and local claims by filing complaints with a state agency and a local commission. Thus, on June 7 and 10, 1986, plaintiff filed discrimination complaints with the Commis-

---

**1.** While this case is fairly brimming with factual disputes, the facts material to the instant motion are essentially undisputed. The facts underlying the discrimination claims are more fully set forth in *Bradley v. Carydale Enterprises, et al.,* 707 F.Supp. 217 (E.D.Va.1989).

**2.** This tenant is Deborah Gill, the third party defendant.

sion and the Board, respectively. Proceedings before each of these bodies are separately described.

### 1. *The Virginia Real Estate Board*

The Board has the power under state law "to receive complaints and conduct investigations of any violation of [the Virginia Fair Housing Law]." Va.Code Ann. § 36–94(a) (1987). The Board proceeds in two stages. First, when a complaint is received, the Board may investigate to determine whether there exists reasonable cause to believe that discriminatory housing practices prohibited by the Virginia Fair Housing Law have occurred. Va.Code Ann. § 36–94(a) (Cum.Supp.1988).[3] If the Board finds "reasonable cause to believe that a licensed broker, salesperson, rental location agent or agency has engaged in [prohibited] discriminatory practices," the Board must attempt "to resolve the matter by conference and conciliation." *Id.* Should conciliation fail, the Board, in the second stage, must "initiate an administrative hearing to determine whether or not to revoke, suspend or fail to renew the license or licenses in question." *Id.* If the alleged violation does not involve a licensed individual, the Board may report its finding of discrimination to the Attorney General of Virginia who then determines whether to file suit to enforce the law. Va.Code Ann. § 36–95 (1984). In the case at bar, only the first stage occurred; the Board investigated plaintiff's complaint and on November 11, 1986, issued its finding of reasonable cause to believe that Carydale had violated the Virginia Fair Housing Law. The Board's investigation was based on witness interviews and sworn statements. The second stage of Board proceedings never occurred. No administrative hearing was held, no live examination and cross examination of witnesses took place, no opportunity for judicial or administrative review was provided Carydale, and no real estate license was suspended, revoked or non-renewed.[4] Nor is there any evidence that the Board advised the Attorney General of its finding or that the Attorney General filed suit against Carydale.

### 2. *The Fairfax County Human Rights Commission*

Virginia law permits counties to establish human rights commissions. Va.Code Ann. § 15–1–783.1 (1986). Such commissions may be empowered to investigate, hold hearings, and process and assist "in the voluntary resolution of complaints regarding discriminatory practices occurring within the county." *Id.* Further, such commissions may "seek, through appropriate enforcement authorities (presumably, a court) prevention of or relief from a violation of any ordinance prohibiting discrimination ...." *Id.* Significantly, however, county-established commissions "have no power ... to issue subpoenas, award damages or grant injunctive relief." *Id.* Fairfax County availed itself of these provisions by establishing the Commission to facilitate enforcement of its anti-discrimination law. *See* Fairfax County Human Rights Ordinance (FCHRO) §§ 11–1–1 *et seq.* (1987). By ordinance, the County has endowed the Commission with certain so-called "powers." FCHRO § 11–1–10 (1987). In fact, they are not so much "powers" as they are authorizations to proceed on the assumption that there will be voluntary compliance.[5] Conspicuously absent is any coer-

---

3. To aid in its investigation, the Board has the authority to interview any person with information relating to the investigation, to request the production of relevant documents, and, if necessary, to issue and serve subpoenas demanding such testimony or production. Va.Code Ann. § 36–94.1 (1984).

4. Indeed, there is no evidence that any of the defendants even possess a real estate license.

5. The Commission's "powers" are as follows:
(1) To receive complaints from any person alleging violations of this Chapter and to investigate such alleged violations; and to investigate, on its own initiative, suspected violations of this Chapter;
(2) To request that any party produce for examination any books, records, papers or other documents or tangible evidence, or that any party answer written interrogatories or oral questions, relating to any matter under investigation by the Commission;
(3) To use methods of persuasion, conciliation and mediation or informal adjustment of grievances, to hold public hearings, and, in the case of complaints of alleged unlawful

cive enforcement power, any subpoena power and any appeal or review process.[6] In essence, once the Commission receives a complaint, the Executive Director investigates and determines whether there are reasonable grounds to believe that a violation of the human rights ordinance has occurred. FCHRO § 11–1–12 (1987). The Executive Director then determines whether to pursue conciliation or to refer the matter to the Commission for a hearing. If the Commission decides to hold a public hearing, the parties are given notice and the opportunity to be heard, including the opportunity to present testimonial and documentary evidence,[7] and to cross examine adverse witnesses. In the event the Commission finds a violation, *inter alia*, it may

> discriminatory acts, to make findings of fact, issue recommendations and publish its findings of fact and recommendations in order to foster compliance with this Chapter;
> (4) To investigate by means of public hearings or otherwise any particular or general conditions having an adverse effect upon any rights protected by this Chapter including alleged violations of this Chapter;
> (5) To request the attendance of witnesses at public hearings, fact finding conferences or other investigative forums conducted by the Commission and to take the testimony of such persons under oath or affirmation;
> (6) To use such voluntary and uncompensated services of private persons, institutions, civic organizations, officials and advisory committees as may from time to time be offered and needed to perform advisory functions;
> (7) To gather and disseminate information about discrimination and other human rights problems affecting the social, economic, cultural and other phases of community life within the County;
> (8) To establish a forum for discussing discrimination and other human rights problems within the County and to form committees with representatives from concerned groups within the County to study and propose solutions to discrimination and other human rights problems within the County;
> (9) To encourage the establishment of advisory committees within County agencies and, when requested by the Board of Supervisors, to establish such an advisory committee or committees; or
> (10) To adopt, promulgate, amend and rescind, subject to the approval of the board of Supervisors, rules and regulations to effectuate the purposes and provisions of this Chapter.
>
> FCHRO § 11–1–10 (1987).

*request* that the offender cease and desist and it may *recommend* that some amount of damages be paid. FCHRO § 11–1–13(c)(4) (1987). But the Commission itself has no coercive enforcement power. Instead, if a violation is found, the Commission may pursue the matter, through the County Attorney, by filing an appropriate action in court only if it first secures authorization from the Board of Supervisors. FCHRO § 11–1–16 (1987). The original County ordinance explicitly recognized that the Commission must prove its case *de novo* in court.[8]

In the case at bar, plaintiff filed a complaint in the Commission only against defendant Carydale.[9] After a full investigation into the complaint,[10] the Commission's

**6.** As noted *infra,* the Commission can enforce its discovery requests, its requests for witnesses to testify or its recommendation for a remedy only by seeking aid of a court of competent jurisdiction. FCHRO § 11–1–16 (1987).

**7.** The Commission is not bound "by the strict rules of evidence prevailing in the courts of law or equity." FCHRO § 11–1–13(c)(4) (1987).

**8.** The 1982 Fairfax County ordinance noted that a trial court's review was *de novo. See* FCHRO § 11–1–9 (1982). This reference was omitted in the 1987 version which simply provides that:
> [w]henever the Commission has a reasonable cause to believe that any person has engaged in, is engaging in or is about to engage in a violation of this Chapter, the Commission may seek through the County Attorney, with the approval of the Board of Supervisors, through appropriate enforcement authorities, prevention of or relief from a violation of this Chapter prohibiting discrimination and to exercise such other powers and duties as provided for in this chapter, however, the Commission shall have no power itself to issue subpoenas, award damages or grant injunctive relief.

FCHRO § 11–1–16(b) (1987).

**9.** The Court's finding that *res judicata* is inappropriate renders it unnecessary to determine whether *res judicata* applies to the other defendants at bar who, while arguably in privity with Carydale, were admittedly not named in plaintiff's Commission and Board complaints.

**10.** The Commission's investigation included a "factfinding conference" held on July 2, 1986 before the Executive Director and other Commission staff. At this conference, the Commission invited Carydale to present testimony and other evidence to support its position. In total,

Executive Director concluded there was "sufficient evidence to support [plaintiff's] allegations of discrimination because of her race (Black)." Letter of Dec. 31, 1986 from Mr. Fred Allen, Executive Director of the Fairfax County Human Rights Commission, to Mr. Dale Weed, Chairman of the Board, Carydale Enterprises. Subsequent conciliation efforts proved fruitless. The Commission then held a hearing at which both sides presented evidence and cross examined witnesses. At issue was whether plaintiff's allegations were true and, if so, whether they constituted a violation of the anti-discrimination ordinance. The hearing, held on May 4, 1988, lasted approximately five hours. Plaintiff claims both sides were fully heard and given the opportunity to present their positions.[11] On June 17, 1988, the Commission issued its ruling that Carydale had violated the ordinance in two respects:

> (1) by denying Ms. Bradley "equal treatment in housing in that Carydale Enterprises, Inc. failed to provide a housing environment free of racial harassment;" and
>
> (2) by its disparate treatment of Ms. Bradley when the "complaints filed by Ms. Felisha Bradley to Carydale Enterprises, Inc. alleging racial harassment were not investigated nor resolved, whereas non-racial complaints filed by

White tenants ... were investigated and resolved."

The Commission served notice to Carydale to "cease and desist" from these violations, to take specific actions "to effectuate the purpose of the Human Rights Ordinance,"[12] and to pay plaintiff $10,000 in compensatory damages. When it became apparent that Carydale did not intend to accept these findings and recommendations, the Commission unsuccessfully sought the authorization of the Board of Supervisors to pursue the matter in court. In closed session, in October, 1988, the Board of Supervisors voted against filing suit in this matter. Shortly thereafter, plaintiff instituted this action in federal court.

### Analysis

**1. Overview**

Where, as here, the issue is whether state administrative findings are entitled to preclusive effect, analysis must begin with the Supreme Court's decision in *University of Tennessee v. Elliott*, 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986). Though not directly in point,[13] *Elliott* states the general principle applicable here:

> When a state agency "acting in a judicial capacity ... resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to liti-

---

five individuals associated with Carydale and plaintiff testified.

**11.** The fairness of that hearing is hotly disputed. Defendants point out that only defendant Weed was present at the hearing; the other defendant representatives and their attorney chose not to attend. Defendants also complain that throughout the investigation and hearing, the interrogating commission staff member did not give Carydale's witnesses a fair opportunity to respond to questions. Plaintiff contends otherwise. Resolution of this dispute is not necessary to the disposition of the instant motion.

**12.** *See* Letter of June 17, 1988, from Sally M. Moore, Chairman, Fairfax Human Rights Commission, to Dale Weed, Chairman of the Board of Carydale Enterprises, at 3. Specifically, the Commission recommended that Carydale:

1. Establish written guidelines regarding procedures for processing complaints alleging discrimination or racial harassment by any

tenant of any housing located in Fairfax County which is managed by Carydale Enterprises, Inc. ...; [and]

2. ... [P]rovide for all its property management located in Fairfax County, a training seminar designed to give instruction regarding equal housing opportunity.

**13.** In *Elliott*, the issue was whether the results of a state administrative proceeding should be given preclusive effect in a federal suit involving Title VII and 42 U.S.C. §§ 1981, 1983 causes of action. The Court, *inter alia*, held that unreviewed determinations by state agencies do not preclude trial *de novo* in federal court on Title VII claims. With respect to the civil rights claims, the Court remanded to consider whether the administrative hearing met the requirements of *United States v. Utah Construction & Mining*, 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966), and whether the resulting findings would be given preclusive effect in the Tennessee court. *See Elliott*, 478 U.S. at 799 n. 8, 106 S.Ct. at 3227 n. 8.

gate," ... federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts.

478 U.S. at 799, 106 S.Ct. at 3227 (footnote omitted) [quoting *United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966)]; *accord Moore v. Allied Chemical Corp.*, 480 F.Supp. 377, 383 (E.D.Va.1979). And it is clear that an "adequate opportunity to litigate" includes giving both parties "a full and fair opportunity to argue their version of the facts and an opportunity to seek court review of any adverse findings." *Utah Construction*, 384 U.S. at 422, 86 S.Ct. at 1560.[14] The questions presented here, therefore, are as follows:

(a) Was the Board or the Commission acting in a judicial capacity to resolve disputed issues of fact properly before it?

(b) Were the parties accorded a full and fair opportunity to litigate the facts, to argue their version of the facts and to seek review of adverse findings?

(c) Would Virginia's courts give preclusive effect to the findings of the Board or Commission in this instance?

Where as here, an affirmative answer to each of these *Elliott* questions is not justified, *res judicata* is not applicable. Each agency proceeding is separately considered.

### 2. *The Virginia Real Estate Board*

In the case of the Board, it appears that none of the questions deserve affirmative answers. It is readily apparent that the Board did not here act in a judicial capacity. No hearing was held, no testimony was taken and there was no genuine opportunity for the parties to litigate fully the issues presented. Nor did Carydale have an op-

portunity to appeal—either administratively or judicially—the Board's findings. Under these circumstances, *res judicata* is inappropriate. *See Utah Construction*, 384 U.S. at 422, 86 S.Ct. at 1560 (*res judicata* applied to administrative decision from which parties, *inter alia*, had "an opportunity to seek court review of any adverse findings"); *Delameter v. Schweicker*, 721 F.2d 50, 53 (2d Cir.1983) (agency decision not entitled to preclusive effect where there is "no hearing, no testimony, no subpoenaed evidence, no argument [and] no opportunity to test any contention by confrontation"); *see also Pettus v. American Airlines, Inc.*, 587 F.2d 627, 629 (4th Cir.1978) (*res judicata* only afforded an administrative decision made "after a full and fair adjudication of its legal and evidential factors"), *cert. denied*, 444 U.S. 883, 100 S.Ct. 172, 62 L.Ed.2d 112 (1979).

Moreover, it is far from clear that Virginia's courts would grant preclusive effect to the Board's determinations with respect to Fair Housing Law violations. A close reading of *Commonwealth of Virginia, ex rel., etc. v. Lotz Realty Co., Inc.*, 237 Va. 1, 376 S.E.2d 54 (1989), suggests that they would not. There, the Board[15] found reasonable cause to believe that the defendant realty company had published discriminatory advertisements. The Board reported its finding to the Attorney General who then filed suit against the realty company in state court. The trial court apparently did not accord the Board's determination any preclusive or presumptive effect; it reversed the Board's ruling. Nor did the Virginia Supreme Court accord the Board's ruling any preclusive or presumptive effect. Indeed, it affirmed the trial court's reversal of the Board, but reversed the trial court's award of attorney's fees. *Id.*

---

**14.** Although *Utah Construction* referred to "court review," it is now apparent that actual court review is not necessary; the opportunity for such review suffices. *See Harrah v. Richardson*, 446 F.2d 1, 2 (4th Cir.1971) ("The doctrine of administrative *res judicata* is firmly established as the law of this circuit even though the prior administrative determination adverse to the claimant was not put to the scrutiny of judicial review."); *Easley v. Finch*, 431 F.2d 1351, 1353 (4th Cir.1970) (administra-

tive *res judicata* applies to unreviewed disability determination).

**15.** In 1985, the Virginia Real Estate Commission was renamed the Virginia Real Estate Board. The complaint involved in *Lotz Realty* was filed before this change, and the decision refers to the "Commission." To avoid confusion with the Fairfax County Commission in the case at bar, this Opinion continues its reference to the "Board."

376 S.E.2d at 59. Had the Board's ruling been entitled to some greater weight, surely the *Lotz Realty* court would have acknowledged this. *Cf. Virginia Real Estate Commission v. Bias,* 226 Va. 264, 268, 308 S.E.2d 123, 125 (1983) (Commission's ruling on violation of one of its own regulations entitled to deferential administrative standard of review). It did not and its silence, though by not conclusive, is persuasive. Here, where no administrative hearing was held and Carydale had no opportunity to seek administrative or judicial review of the finding, the application of *res judicata* principles is even less justified.

### 3. *The Fairfax Human Rights Commission*

The Commission's findings stand on a different footing from the Board's, but the result is ultimately the same: no confident affirmative answers to the *Elliott* questions can be given and hence *res judicata* is inappropriate. To be sure, it may more plausibly be argued that the Commission, in contrast to the Board, acted in a judicial capacity to resolve issues properly before it. At length, however, even here this argument is unconvincing. Unlike the typical judicial or quasi-judicial body, the Commission itself lacks subpoena power, the power to compel the parties to attend and produce evidence, and hence the power to insure that issues are fully litigated. More significant, perhaps, is the lack of any coercive enforcement power. Only with the Board of Supervisors' authorization may the Commission seek enforcement through the courts. In this instance, that authorization was denied for reasons never made public. The Commission's lack of coercive enforcement power coupled with the denial, in this instance, of authority to proceed in the courts would create an anomalous situation if the Commission's findings were accorded preclusive effect: preclusive effect for Commission findings would facilitate judicial enforcement where the Board of Supervisors, the Commission's creator, has determined, for whatever reason, that there should be no judicial enforcement. In these circumstances, it is difficult to see that the Commission acts in a "judicial capacity." Rather, the Commission may more accurately be viewed as an investigatory body that relies on voluntary compliance and acts chiefly as a conciliator and facilitator.

Central to the question of preclusive effect is whether the findings in question would be accorded that effect in state court. There is no persuasive reason to believe they would. Neither side has cited any controlling Virginia authority. Plaintiff's authorities are significantly distinguishable; none involves a body similar to the Board or Commission. Each of those bodies, a court, commission or administrative agency, is vested with the coercive enforcement powers that reflect the authority to act in a judicial capacity.[16] Moreover, the decisions of each of these bodies were potentially subject to some form of administrative and, ultimately, judicial review. That is not the case here. Defendants had no opportunity to appeal—either judicially or even administratively—the Commission's decision. The contrast between these bodies and the Commission points persuasively to the conclusion reached here.[17]

16. *See, e.g., Commissioner v. Sunnen,* 333 U.S. 591, 597–607, 68 S.Ct. 715, 719–24, 92 L.Ed. 898 (1948) (effect of federal Board of Tax Appeals' decision on subsequent court proceeding); *Easley v. Finch,* 431 F.2d 1351 (4th Cir.1970) (effect of Social Security Administration administrative law judge finding on federal court action); *Flora, Flora & Montague, Inc. v. Saunders,* 235 Va. 306, 367 S.E.2d 493 (1988) (effect of unappealed state circuit court decision); *Graham v. VEPCO,* 230 Va. 273, 337 S.E.2d 260 (1985) (effect of unappealed State Corporation Commission decision); *Bates v. Devers,* 214 Va. 667, 202 S.E.2d 917 (1974) (effect of federal district court decision on Virginia circuit court proceeding); *Pick-eral v. Federal Land Bank of Baltimore,* 177 Va. 743, 15 S.E.2d 82 (1941) (effect of unappealed state circuit court decision); *Childress v. Beatrice Pocahontas Co.,* 6 Va.App. 88, 366 S.E.2d 722 (1988) (effect of Virginia Industrial Commission decision on subsequent Commission decision).

17. Plaintiff suggests that the deletion in 1987 of the FCHRO's reference to a court's *de novo* review signifies the implicit adoption of a more deferential standard. The Court is not persuaded. A county ordinance does not, and indeed cannot, dictate what effect the findings of

### Conclusion

In certain circumstances, giving preclusive effect to state administrative findings serves the important goals of repose and federalism. *See University of Tennessee v. Elliott,* 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986); *Thomas v. Washington Gas Light Co.,* 448 U.S. 261, 281–285, 100 S.Ct. 2647, 2660–61, 65 L.Ed.2d 757 (1980). But under the precise facts of this case, the Court concludes that the Board's and Commission's findings are not entitled to *res judicata* effect. Neither body acted in a genuine judicial capacity, nor did it appear that state courts would accord preclusive effect to the Board's or Commission's findings. Not presented or decided here, however, is whether these findings may be introduced into evidence in a *de novo* trial in court. Ample authority exists suggesting that admissibility may be warranted.[18]

An appropriate Order has issued.

---

a county agency will have in state or federal court proceedings. Rather, such a provision, to the extent that it was included in an earlier version of the FCHRO, acts, at best, merely as a predictor of what effect the Commission's findings may be accorded in subsequent court proceedings. The 1987 deletion, therefore, is of no significance to this Court's ruling.

18. In *Chandler v. Roudebush,* 425 U.S. 840, 863 n. 39, 96 S.Ct. 1949, 1961 n. 39, 48 L.Ed.2d 416 (1976), the Supreme Court, in a Title VII case, indicated that administrative findings regarding discrimination are admissible in a subsequent federal trial *de novo.* The general proposition has found application in a wide variety of analogous contexts. *See, e.g., Philbrook v. Ansonia Bd. of Educ.,* 757 F.2d 476, 481 (2d Cir.1985) (EEOC finding is admissible, but not determinative), *aff'd,* 479 U.S. 60, 107 S.Ct. 367, 93 L.Ed.2d

305 (1986); *Woods–Drake v. Lundy,* 667 F.2d 1198, 1202 (5th Cir.1982) (HUD report admissible); *Bradshaw v. Zoological Soc. of San Diego,* 569 F.2d 1066, 1069 (9th Cir.1978) (same); *Hodge v. Seiler,* 558 F.2d 284, 288–89 (5th Cir. 1977) (same); *Smith v. Universal Services, Inc.,* 454 F.2d 154, 157–58 (5th Cir.1972) (EEOC finding admissible provided it is "not self-serving nor compiled for purposes of litigation only"); *Fayson v. Schmadl,* C.A. No. 87–1975 (D.D.C. Aug. 23, 1988) (HUD report including housing discrimination finding admissible in trial *de novo* pursuant to Rule 803(8)(C), Fed.R.Evid.); *LaDolce v. Bank Administration Inst.,* 585 F.Supp. 975, 977 (N.D.Ill.1984) (HUD report admissible). *Compare Cox v. Babcock & Wilcox Co.,* 471 F.2d 13 (4th Cir.1972) (trial court has discretion to admit or exclude EEOC records in Title VII action).